# In the United States Court of Federal Claims

## FOR PUBLICATION

No. 24-2110C
(Filed: November 5, 2025[*])

|  |  |
|---|---|
| **BOWHEAD ENTERPRISE, SCIENCE AND TECHNOLOGY, LLC**, | ) ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| **UNITED STATES**, | ) ) ) |
| *Defendant,* | ) ) |
| and | ) ) |
| **DNI EMERGING TECHNOLOGIES, LLC**, | ) ) ) |
| *Defendant-Intervenor.* | ) ) |

---

*Robert K. Tompkins* (argued), Holland & Knight LLP, Washington, DC, for plaintiff. With him on the briefs were *Hillary J. Freund* (argued), *Richard J. Ariel* (argued), Holland & Knight LLP, Washington, DC; *Tanner N. Slaughter* (argued), and *Kelsey M. Hayes*, Holland & Knight LLP, Tysons, VA.

*Kelly E. Palamar* (argued), Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With her on the briefs were *Brett A. Shumate*, Assistant Attorney General, and *Patricia M. McCarthy*, Director, *William J. Grimaldi*, Assistant Director, and *Kyle S. Beckrich*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Cpt. Sana H. Daniell*, Trial Attorney, U.S. Army Legal Services Agency, Fort Belvoir, VA; and *Brittany York*, Attorney Advisor, Army Materiel Command Legal Center, Aberdeen Proving Ground, MD, Of Counsel.

---

[*] This opinion was originally filed under seal on September 30, 2025. The Court provided the parties an opportunity to review the decision for any proprietary, confidential, or other protected information and submit proposed redactions. On November 4, 2025, defendant-intervenor proposed redactions. Those adopted by the Court are denoted using "{redacted}."

*James Y. Boland* (argued), Venable LLP, Tysons, VA, for defendant-intervenor. With him on the briefs were *Emily R. Marcy* (argued) and *Taylor M. Sorrells*, Venable LLP, Tysons, VA.

## OPINION AND ORDER

***BONILLA, Judge.***

This post-award bid protest involves a United States Army contract to perform systems engineering and program management (SEPM) support services. Plaintiff Bowhead Enterprise, Science and Technology, LLC (Bowhead) contests the award of the military contract to defendant-intervenor DNI Emerging Technologies, LLC (DNI). Included in the catalog of procurement issues raised, Bowhead: alleges an unmitigated organizational conflict of interest (OCI); challenges the contracting officer's voluntary remand investigation; disputes the comparative evaluations of Bowhead's and DNI's technical and cost proposals and assigned adjectival ratings; questions the past performance adjectival ratings assigned to Bowhead and DNI; and, cumulatively, calls into question the Army's best-value determination. Bowhead seeks permanent injunctive relief preventing DNI's performance of the recently awarded SEPM contract and directing the Army to reopen discussions with the offerors in the competitive range.

Pending before the Court are plaintiff's motion for judgment on the administrative record (ECF 55) and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record (ECF 56, 57). The Court heard oral argument on September 24, 2025. For the reasons below, plaintiff's dispositive motion is DENIED, and defendant's and defendant-intervenor's dispositive cross-motions are GRANTED.

## BACKGROUND

Headquartered at Aberdeen Proving Ground, Maryland, the Program Executive Office Command, Control, Communications, and Network (PEO C3N) is responsible for developing, fielding, and sustaining various command, control, cyber, intelligence, surveillance, reconnaissance, and communications systems for the Army's use on the digital battlefield.[1] Under this mandate, on June 30, 2023, PEO C3N solicited proposals for SEPM support services "to augment PEO C3T's core Government personnel in support of PEO-wide program management, development, and fielding of Command, Control, and Communication systems." AR 597.[2] The events giving rise to this bid protest stem from the Army's evaluation of the proposals

---

[1] Prior to October 1, 2024, the PEO C3N was known as the Program Executive Office Command, Control, Communications – Tactical (PEO C3T). For clarity, throughout this decision, the agency's current name will be used unless quoting from records referencing the pre-redesignation name.

[2] "AR __" is a citation to a Bates-numbered page in the administrative record filed in this case.

submitted in response to the solicitation resulting in the award of the SEPM contract to DNI.

The request for proposals (RFP) was issued as a competitive Small Business Administration (SBA)-certified 8(a) program set-aside and contemplated a five-year ordering period capped at $100 million. Employing a best-value selection process, the RFP required interested contractors to submit four written proposal volumes: (1) technical, (2) past performance, (3) cost/price, and (4) miscellaneous submittals. The technical volume comprised two factors. Technical Factor 1 (Demonstration of Knowledge) addressed "the offeror's proposed ability to tackle Systems of Systems Technical Challenges" throughout the life of the contract. AR 619. Technical Factor 2 (Technical Readiness) was further divided into three subfactors: (i) program management plan, (ii) staffing approach, and (iii) management transition-in plan. During the evaluation process, each technical factor and subfactor would be assigned one of five risk- and content-based adjectival ratings—ranging from "unacceptable" to "outstanding"—measured by determined strengths, weaknesses, significant weaknesses, uncertainties, and deficiencies.

The past performance metric, as its name suggests, sought up to five recent and relevant experiences with underlying data demonstrating an offeror's ability to successfully perform under the SEPM contract. Assessing the recency of the cited examples, the Army would assign a rating of "acceptable" or "unacceptable." Relevancy, in turn, would be evaluated using four measures ranging from "not relevant" to "very relevant." Reviewing past performance questionnaires, interviews, contractor performance assessment reports, and/or other sources, the Army would then assign an overall performance confidence assessment using one of five adjectival ratings—ranging from "no confidence" to "substantial confidence"—reflecting the extent of the Army's belief that the offeror was likely to "successfully perform the required effort." AR 623.

In addition to proposing a total cost/price, offerors were invited to "provide whatever information is necessary to help the Government understand why the proposed costs are realistic . . . ." AR 610–11 (emphasis omitted). Using that data, the Army would "fully evaluate (and negotiate, if applicable) all priced Contract Line Item Numbers (CLINs) for award at the task order level." AR 623. For each cost/price proposal, the RFP instructed the Army to undertake a cost realism evaluation to "determine the probable cost of performance as it relates to the technical approach proposed by each Offeror [to] be utilized in the selection of the offer that provides the best value to the Government." *Id.* The RFP also instructed the Army to assess each proposal's overall cost/price for compliance issues, unbalanced pricing, errors, business systems, total evaluated price, and the option to extend services.

As for the miscellaneous submittals, the RFP instructed each offeror to submit itemized reports, declarations, plans, and certifications for the Army to assess as either "acceptable" or "unacceptable," depending on the completeness of the

documents supplied.  Relevant here, the solicitation required each offeror to "identify and address in its proposal all actual or potential OCI situations with itself, subcontractors, partners, or any other Offeror as it applies to this RFP, per [Federal Acquisition Regulations (FAR)] 9.5, or state that there are no known potential OCIs." AR 598.  This provision stemmed from FAR 1.102-2(c)(1) and FAR 3.101-1, which "require disqualification of a procurement offeror where impropriety or the possibility of an unfair competitive advantage in the acquisition process is present."[3]  *Command Mgmt. Servs., Inc. v. United States*, 111 Fed. Cl. 279, 288 (2013) (first citing *NKF Eng'g v. United States*, 805 F.2d 372, 377 (Fed. Cir. 1986); and then citing *TeleComm. Sys. Inc.*, B-404496.3, 2011 CPD ¶ 229 at 2 (Comp. Gen. Oct. 26, 2011)); *accord Am. K-9 Detection Servs., LLC v. United States*, 155 Fed. Cl. 248, 285 (2021) ("Even 'a finding of an appearance of impropriety' is sufficient for a finding of OCI.") (quoting *NKF Eng'g*, 805 F.2d at 376).

Addressing the respective weight to be afforded each factor, the RFP instructed: "Technical Factors 1 and 2 are equally important. When combined, the two technical factors are significantly more important than Cost/Price and Past Performance combined. Past Performance is significantly more important than Cost/Price." AR 617.  Still, the Army "reserve[d] the right to make [the] award based upon the Cost/Price factor in the event that the two Technical factors, Past Performance, and Miscellaneous Submittals evaluation results of all the offerors' proposals are substantially the same." AR 618.  That said, continued consideration for award required ratings of "acceptable" or higher for Technical Factor 1, Technical Factor 2, and the miscellaneous submittals, as well as a minimum assessment of "neutral confidence" for past performance.

The Army received five proposals in response to the SEPM solicitation by the July 31, 2023 deadline, including from Bowhead and DNI.  After an initial evaluation by the Source Selection Evaluation Board (SSEB), on March 29, 2024, the contracting officer, with the concurrence of the Source Selection Authority (SSA), established a

---

[3] FAR 3.101-1 provides, in relevant part:

> Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

48 C.F.R. § 3.101-1; *see* AR 4561 ("To prevent unfair competitive advantage and prevent the existence of conflicting roles that may impair a contractor's objectivity, the FAR instructs Contracting Officers to *identify potential* OCIs as early as possible in the procurement process and avoid, neutralize, or mitigate *significant* conflicts *before* contract award." (emphasis in original)).

competitive range that included Bowhead, DNI, and a third offeror.[4]   The Army thereafter opened discussions with each member of the competitive range.  Inviting Bowhead to participate, the agency issued two Evaluation Notices.  The first, relevant to a weakness assigned under Technical Factor 1 (Demonstration of Knowledge), requested that Bowhead "provide adequate justification to support knowledge of working with or using the financial systems required for execution of funding."  AR 2412 (emphasis omitted).   The second, addressing a cited weakness under Technical Factor 2 (Technical Readiness), subfactor 1 (program management plan), requested that Bowhead "provide adequate justification to support an approach to meet badging requirements."[5]   AR 2412–13 (emphasis omitted).   Bowhead timely responded with an updated proposal.

Following discussions, the SSEB evaluated the final proposal revisions and presented the board's final evaluation results to the Source Selection Advisory Council (SSAC) and the SSA.  The comparative assessments of Bowhead's and DNI's proposals are reflected in the chart below.

| Factor | Bowhead | DNI |
|---|---|---|
| Technical Factor 1 | Acceptable | Good |
| Technical Factor 2 | Good | Good |
| –    subfactor 1 | Good | Good |
| –    subfactor 2 | Outstanding | Good |
| –    subfactor 3 | Good | Good |
| Past Performance | Satisfactory Confidence | Satisfactory Confidence |
| Probable Cost | $80,997,280 | $68,317,406 |
| Miscellaneous Submittals | Acceptable | Acceptable |

AR 4200–01, 4385.    Addressing the ratings assigned for Technical Factor 1 (Demonstration of Knowledge), the Army explained: although Bowhead was assigned three strengths and no weaknesses or deficiencies, "the strengths did not elevate the offeror[']s approach and understanding of the requirements to the thorough threshold required for Good rating."  AR 4216.  DNI, by comparison, was given five strengths and no weaknesses or deficiencies and presented the overall "strongest proposal" for Technical Factor 1.  AR 4217.  Turning to Technical Factor 2 (Technical Readiness), as captured above, both Bowhead and DNI were assigned "good" ratings for the first and third subfactors.  With respect to the second subfactor, however, Bowhead was rated "outstanding," whereas DNI received a "good" rating.  AR 4200–01.  Addressing this delta, the Army explained: "[Bowhead's] demonstration of overall Technical Readiness, although equal in adjectival rating to [DNI and another offeror], is the stronger [sic] of the three Good ratings."[6]   AR 4217–18.

---

[4] A fourth offeror was added to the competitive range three months later.

[5] In opening discussions with DNI, the Army issued ten Evaluation Notices, of which two related to assigned weaknesses.

[6] The fourth member of the competitive range received an "acceptable" rating for Technical Factor 2.

Next, as further explored below, notwithstanding comparable "satisfactory confidence" ratings for past performance, the Army found DNI's cited experience "slightly better" and "stronger" than Bowhead's. AR 4222.[7] With respect to cost/price, Bowhead's total probable cost was assessed—consistent with the offeror's submission—at $80,997,280. DNI's total probable cost, in turn, was adjusted upward by $920,347 to $68,317,406.[8] All members of the competitive range, including Bowhead and DNI, received "acceptable" ratings for their miscellaneous submittals.

After reviewing the relevant documentation and consulting with the SSEB and the SSAC, the SSA "determined that the proposal submitted by DNI . . . offers the best overall value to satisfy the stated requirements for the [SEPM contract]." AR 4193. Consequently, the Army awarded the military contract to DNI on November 8, 2024, and simultaneously notified Bowhead and the other members of the competitive range of their non-selection.[9] Following a requested post-award debrief, Bowhead filed this bid protest on December 20, 2024.[10] Bowhead filed an amended complaint after reviewing the administrative record, alleging the Army failed to identify and properly consider and mitigate three potential OCIs posed by DNI's proposed subcontractors: unequal access to information, biased ground rules, and impaired objectivity. During a voluntary remand, the Army investigated Bowhead's OCI allegations and found them unsubstantiated.

---

[7] Evaluators researched the Contractor Performance Assessment Reporting System (CPARS) ratings for the past performance examples cited by both Bowhead and DNI. Of Bowhead's three examples, two did not receive a CPARS rating, and the third was rated exceptional. Both examples reviewed by the Army for DNI were rated exceptional.

[8] The nearly $1 million adjustment to DNI's proposed cost is attributed to the offeror's submission of updated fringe, overhead, and general and administrative (G&A) costs. Pursuant to the FAR, government contracts are initially based on anticipated or provisional billing rates (PBR) intended to approximate indirect costs. 48 C.F.R. § 52.216-7(e)(1). At the end of each year, the contractor must submit an incurred cost submission (ICS) detailing actual indirect costs incurred. *Id.* § 52.216-7(h)(1); *see generally U.S. Enrichment Corp. v. United States*, 121 Fed. Cl. 532, 533–34 (2015) (explaining PBRs and ICSs). DNI based its proposed indirect rates on its 2023 PBR and later submitted its actual indirect rates in its 2023 ICS. Because DNI's 2023 ICS (i.e., actual) rates were *higher* than its 2023 PBR (i.e., proposed) rates, the cost evaluator adjusted DNI's fringe and overhead rates upward to reflect the 2023 ICS rates. While DNI's 2023 ICS G&A rate was *lower* than its 2023 PBR G&A rate, the Government took no exception to DNI's use of the higher PBR rate because "[p]roposing a higher rate [would not have] provide[d] [DNI] a competitive advantage." AR 4162. Overall, the cost evaluator adjusted DNI's probable G&A cost upward "due to the adjustments made to fringe and overhead rates." *Id.*

[9] Following the expiration of the legacy SEPM contract in May 2024, as the incumbent prime and subcontractors, respectively, Bowhead Business and Technology Solutions, LLC (BBTS) and Bowhead and Netorian, LLC continued performing under a bridge contract. Switching principal roles with BBTS, Bowhead's current proposal lists BBTS and Netorian as its subcontractors.

[10] Prior to commencing this action, Bowhead filed an unsuccessful size protest with the SBA alleging DNI was in violation of the ostensible subcontractor rule, citing 13 C.F.R. § 121.103(h) (affiliation based on joint ventures).

## DISCUSSION

### I.  Standard of Review

Under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC), "a party may move for partial or other judgment on the administrative record . . . ."  RCFC 52.1(c)(1).  Where, as here, the parties file cross-motions for judgment on the administrative record, the Court adjudicates the matter "as if it were conducting a trial on the record."  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005), *cited in Young v. United States*, 497 F. App'x 53, 58–59 (Fed. Cir. 2012).

When called upon to review a federal agency's procurement decision, this Court employs the Administrative Procedure Act (APA) standard and must determine whether the challenged action was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.  5 U.S.C. § 706(2)(A), *cited in* 28 U.S.C. § 1491(b)(4).  "The arbitrary and capricious standard is highly deferential and requires this Court to sustain an agency action evincing rational reasoning and consideration of relevant factors."  *Clean Team Janitorial Serv., Inc. v. United States*, 171 Fed. Cl. 1, 8 (2024) (first citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); and then citing *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008)).  An agency's procurement decision is arbitrary and capricious "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted); *accord Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  With respect to challenges brought under the first ground, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Centech*, 554 F.3d at 1037 (quoting *Impresa*, 238 F.3d at 1332–33).  As for the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Id.* (quoting *Impresa*, 238 F.3d at 1333).

### II.  Organizational Conflict of Interest

Bowhead asserts that the Army's post hoc OCI investigation failed to identify, consider, and mitigate a significant impaired objectivity OCI posed by DNI's designated subcontractors.[11]  As this Court recently explained:

---

[11] As noted *supra*, Bowhead's amended complaint also asserted unequal access to information and biased ground rules OCIs.  Bowhead did not brief these OCI allegations, and counsel affirmatively waived them during oral argument.

An impaired objectivity OCI occurs when a government contractor has conflicting obligations under different government contracts or is tasked with evaluating its own offers for products or services, or those of a competitor. The primary concern under this type of OCI is that a firm might not be able to render impartial advice due to its other contract obligations or its relationship with the entity being evaluated. To demonstrate an impaired objectivity OCI, a party must point to facts showing that a government contractor's work under one government contract could entail its evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals.

*Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. 512, 545–46 (2025) (cleaned up) (citations omitted).[12]    Bowhead contends that such a conflict could—and likely would—arise in awarding the SEPM contract to DNI.  In support, Bowhead cites the ongoing work of DNI's designated subcontractors on other contracts administered by and through PEO C3N.    Bowhead maintains that winning this contract would position DNI to review its proposed subcontractors' work on those other contracts. The concern is that DNI will not be impartial in evaluating their own subcontractors' work on other PM-level contracts.  Although facially appealing, Bowhead's arguments fail upon closer examination.

The determination of whether an offeror can ably perform a contract free from potential conflicts of interest generally rests with the contracting officer.  *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009) ("[T]he identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion.") (first citing 48 C.F.R. § 9.505; and then citing *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 202 (2007)).[13]  Although OCI inquiries are preferably performed pre-award, courts

---

[12] OCIs can occur in situations where an entity's relationship with a different, but related, entity gives rise to a conflict of interest.  *See* 48 C.F.R. § 2.101 ("Organizational conflict of interest means that because of other activities *or relationships with other persons*, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." (emphasis added)); *Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 569 (2010) (noting that the "primary concern" under an impaired objectivity OCI "is that a firm might not be able to render 'impartial advice' due to its relationship with *the entity being evaluated*" (emphasis added)) (quoting *Aetna Gov't Health Plans, Inc.*, B-254397 et al., 1995 WL 449806, at *9 (Comp. Gen. July 27, 1995)), *aff'd*, 645 F.3d 1377 (Fed. Cir. 2011).  Relevant factors in determining whether a relationship between entities is sufficiently close effect an OCI include "the closeness of the connection between firms, the directness of a financial relationship, and the specific facts that could indicate whether a relationship was close enough or too attenuated to support an OCI." *Turner Constr.*, 94 Fed. Cl. at 579.

[13] FAR 9.505 provides in part:

Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a

often rely on post-award investigations to "clear the air of any OCI taint by showing that no significant OCI existed" or that the potential OCI was properly mitigated. *Turner Constr.*, 645 F.3d at 1386. Due to the fact-specific nature of OCI inquiries, courts give considerable deference to the contracting officer. *See PAI Corp. v. United States*, 614 F.3d 1347, 1351–52 (Fed. Cir. 2010) (quoting *Axiom*, 564 F.3d at 1382 (citing 48 C.F.R. § 9.505)). The deference accorded is twofold. *See Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1380 (Fed. Cir. 2024) (describing "twin layers" of deference owed to contracting officer's OCI determination). First, "the FAR provides a contracting officer with considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts and to develop a mitigation plan in the event that a significant potential conflict exists." *PAI Corp.*, 614 F.3d at 1352–53 (first citing 48 C.F.R. § 9.505; and then citing *Axiom*, 564 F.3d at 1382), *quoted in Oak Grove*, 116 F.4th at 1380. Second, courts must further take into account the "strong presumption" that government officials duly exercise their duties in good faith. *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986), *quoted in Oak Grove*, 116 F.4th at 1380.

To rebut these presumptions, "a protester must identify 'hard facts'" as opposed to "a mere inference or suspicion of an actual or apparent conflict . . . ." *PAI Corp.*, 614 F.3d at 1352 (first quoting *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983); and then citing *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 380 (2004)); *cf. Turner Constr.*, 645 F.3d at 1387 ("'[H]ard facts' do not need to show an actual conflict—a potential conflict can be sufficient.") (citation omitted). Bowhead's challenges to the OCI investigation conducted in this case generally fall into three buckets. First, the contracting officer simply engaged in "a litigation-driven exercise to support [a] preordained conclusion." ECF 55 at 22. Second, the contracting officer failed to appreciate that awarding DNI the SEPM contract would position the contractor to evaluate its own performance under other contracts concurrently administered by PEO C3N. Third, the Army failed to account for the potential or actual OCI in evaluating DNI's technical proposal, resulting in inflated ratings. These issues are addressed seriatim.

Contrary to Bowhead's assertion, the contracting officer conducted a thorough OCI investigation—which included consulting technical experts, reviewing dozens of documents, and soliciting information from agency officials as well as DNI and its designated subcontractors—culminating in the production of a well-reasoned, documented report. Moreover, in charging that the contracting officer engaged in a perfunctory exercise toward a predetermined outcome, Bowhead's allegations fail to

---

significant potential conflict exists and, if it does, the development of an appropriate means for resolving it.

48 C.F.R. § 9.505.

satisfy the high burden of proof required.[14]  *Sanders*, 801 F.2d at 1331 ("There is a strong presumption in the law that administrative actions are correct and taken in good faith. It takes 'well-nigh irrefragable proof' to overcome the presumption.") (first quoting *Fucik v. United States*, 655 F.2d 1089, 1097 (Ct. Cl. 1981); then citing *Gaskins v. United States*, 227 Ct. Cl. 563, 566 (1981); and then citing *Diggin v. United States*, 661 F.2d 174, 178 (Ct. Cl. 1981).  For example, accepting Bowhead's criticism of the "template declarations" sent to Army personnel would require this Court to assume—without proof—that each signatory made a false statement to this Court under penalty of perjury.[15]

As for the scope of the OCI investigation, the contracting officer looked back to assess whether DNI or its designated subcontractors were involved in or otherwise supported the SEPM procurement.[16]  Contrary to Bowhead's contention, moreover, the contracting officer also looked forward to assess whether DNI and its designated subcontractors would be positioned to review their own work on other PEO C3N contracts if awarded the SEPM contract.[17]  Bowhead's mere disagreement with the

---

[14] Notwithstanding counsel's argument to the contrary, Bowhead's allegation that the Army's OCI decision was predetermined—and, therefore, that its analysis was pretextual—is tantamount to an allegation of bad faith.  *See Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1288 (Fed. Cir. 2010) (noting "government officials are presumed to act in good faith" in rejecting argument that agency engaged in a pretextual attempt to circumvent a trial court's previous injunction) (citing *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993)); *see also, e.g.*, *Bae Sys. Norfolk Ship Repair, Inc. v. United States*, 163 Fed. Cl. 217, 238 (2022) ("The Court . . . finds that Plaintiff's pretext argument is no different than a claim that the government acted in bad faith, and Plaintiff must meet the high standard of clear and convincing evidence.").

[15] Bowhead's charge is further undermined by the agency's instruction to declarants in reviewing the draft declaration: "As this is part of the OCI investigation and will be reviewed by the Court of Federal Claims, we are requesting the edits to your declaration to ensure clarity and increase the detail to the document where necessary."  *See, e.g.*, AR 7274, 7278, 7342, 7366, 7384.

[16] *See, e.g.*, AR 4589 ("I considered numerous other declarations from Government employees. Notably, the Government employees confirmed that to their knowledge, at no point did contractors provide support, insight, or advice for the SEPM procurement."), 4592–93 ("No nongovernment personnel were involved in the SEPM procurement, including crafting the procurement strategy, evaluating proposals, and/or making the source selection decision. As only Government personnel were involved in the SEPM effort, and thus no contractors were afforded the opportunity to provide impartial advice or judgment on this effort, there is no conflict.").

[17] *See, e.g.*, AR 4587 ("DNI . . . , JANUS, Tecolote, and DEI Tech each individually affirmed that they do not have contracts with conflicting obligations that would compromise their ability to render impartial judgment."), 4591 ("JANUS further clarified the support they provided under the [Project Manager Tactical Network (PM TN), Systems Engineering and Technical Assistance (SETA) Services] contract as being for specific systems and programs, and 'since the SEPM contract does not supervise, evaluate, or influence the PM SETA work, and does not include the acquisition of any of the systems/programs that are the subject of the PM TN SETA work, JANUS determined that there is not an actual or potential OCI on this and other PM task orders.'"), 4592 ("While [SETA] support contractors at the PM level may play a role in providing input to documents, all work is reviewed and vetted through Government employees. SETA employees by their very nature cannot take ownership

focus and breadth of the OCI investigation, and the level of detail included in the contracting officer's documented assessment, cannot serve as the basis for this Court to find the remand inquiry insufficient.[18]  *See, e.g.*, *Paradyme Mgmt., Inc. v. United States*, 167 Fed. Cl. 180, 190 (2023) (quoting *Koam Eng'g Sys., Inc. v. United States*, 164 Fed. Cl. 128, 168 (2022)); *cf. Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (first citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); and then citing *Colo. Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945)).

The Court declines Bowhead's invitation to further kick the proverbial tires on the Army's OCI investigation to assess whether the inquiry was sufficiently exhaustive and, relatedly, whether an unimpeachable decision was reached.  To do so would constitute reversable error.  *See, e.g.*, *Oak Grove*, 116 F.4th at 1380–81, *quoted in ITellect, LLC v. United States*, 173 Fed. Cl. 550, 560 (2024) ("A court may not second-guess the adequacy of an agency's OCI investigation and may not overturn an agency's conclusion, even when the agency failed to take additional investigative steps that may have been appropriate. The scope of an OCI investigation remains 'a proper exercise of the agency's discretion.'").  Given the absence of a confirmed OCI, no mitigation plan was required to be submitted by DNI or assessed by the Army under the terms of the RFP or the FAR.  *See* AR 598 ("*If* any actual or potential OCIs are identified, *then* the Offeror shall submit a mitigation plan . . . ." (emphasis added)); 48 C.F.R. § 9.506(b) (requiring contracting officer to analyze whether a potential conflict could be mitigated "*[i]f* the contracting officer decides that a particular acquisition involves a significant potential organizational conflict of interest" (emphasis added)).  The absence of a confirmed OCI further defeats

---

or approve any documentation developed by the PM or HQ.") (citation omitted), 4593 ("JANUS did not have conflicting obligations under the PM TN SETA contract and the follow-on SEPM effort that could have compromised their ability to render impartial judgment.").

[18] Bowhead contends that the contracting officer erred in failing to perform a documented review of the respective performance work statements (PWSs) during the OCI investigation.  In support, Bowhead cites this Court's opinion in *Sigmatech, Inc. v. United States*, 141 Fed. Cl. 284 (2018), and several GAO decisions, including *DirectViz Sols., LLC*, B-423366 et al., 2025 WL 1745028, at *10 (Comp. Gen. June 11, 2025).  While these cases support the notion that a contracting officer may—and perhaps should—perform a comparative assessment of the relevant PWSs during OCI investigations, they do not require it in every case.  Nor do they compel a finding that the failure to do so is axiomatically arbitrary, capricious, an abuse of discretion, or contrary to law.  In fact, *Sigmatech* highlights the "considerable discretion" afforded contracting officers in deciding the investigative steps to be taken in an impaired objectivity OCI inquiry and "determining whether a potential or actual OCI existed."  141 Fed. Cl. at 335 (citing *PAI Corp.*, 614 F.3d at 1352–53); *accord* 48 C.F.R. § 9.505 ("Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract.").

Bowhead's assertion that DNI's ratings were improperly inflated due to the Army's failure to offset the assigned strengths of DNI's proposal by the claimed OCI.[19]

## III.  Comparative Evaluation

Procurement officials must evaluate proposals in accordance with the terms specified in the governing solicitation. *Ginn Grp., Inc. v. United States*, 159 Fed. Cl. 593, 602 (2022); *accord Dubinsky v. United States*, 43 Fed. Cl. 243, 267 n.56 (1999) ("[T]he FAR permits agencies broad discretion in selecting the rating system to be used in a procurement. Nevertheless, this regulation does not grant contracting officers carte blanche to notify offerors of one rating system in the RFP and then apply a different system during the evaluation of proposals. . . . Such action is arbitrary and capricious and provides grounds for granting a protest if it prejudices unsuccessful offerors.") (citations omitted); *cf. Red Cedar Harmonia, LLC v. United States*, 840 F. App'x 529, 532–33 (Fed. Cir. 2020) (agency acted within its "broad discretion" where "[t]here is no evidence that the agency relied upon criteria outside the designated criteria under [the solicitation]").[20]  "When the evaluation of proposals materially deviates from the evaluation scheme described in the solicitation, the agency's failure to follow the described plan may constitute evidence of arbitrary and capricious decision-making." *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 654 (2008) (citing *Dubinsky*, 43 Fed. Cl. at 267 n.56).  "Minor irregularities alone, however, will not invalidate a procurement that is reasonable and otherwise not contrary to law." *Id.* (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) ("De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are.") (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992))).

### A.  Technical Factor 1

Bowhead's principal argument regarding Technical Factor 1 (Demonstration of Knowledge) is that the Army improperly assigned DNI's proposal a strength for

---

[19] Nor were DNI's ratings improperly inflated due to the Army's failure to offset DNI's assigned strengths by alleged contradictions in DNI's responses to the OCI inquiry.  On this issue, Bowhead overstates the extent to which DNI's responses to the OCI inquiry contradicted the awardee's technical proposal.  Just because DNI's subcontractors might have a narrow role in the SEPM contract does not mean they would be prevented from sharing their knowledge of the relevant systems with DNI and other subcontractors.  *See* AR 4006 (assigning strengths to offeror DNI as opposed to designated subcontractors), 4203–04 (same).  Further, the fact that DNI preliminarily assigned roles to designated subcontractors would not prevent DNI from shifting responsibilities should an unanticipated OCI arise.  In any event, DNI's proposal bested Bowhead's proposal by two strengths for Technical Factor 1.

[20] FAR 15.305 provides, in relevant part: "An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." 48 C.F.R. § 15.305(a).

highlighting its familiarity with Capability Set 23 when the RFP purportedly instructed offerors to confine their proposals to Capability Set 21.[21]  Regarding its own proposal, Bowhead maintains that the Army failed to adhere to the RFP's adjectival definitions in improperly assigning Bowhead a lower rating than DNI. Bowhead further asserts that the Army arbitrarily identified a new flaw in Bowhead's proposal *after* discussions, depriving the offeror of the opportunity to address the issue.  Each of these challenges falls short.

Relevant to DNI's credited reference to Capability Set 23, the solicitation provided:

> Background and basis for demonstration of knowledge: In Capability Set 21, the Integrated Tactical Network (ITN) was expanded to increase Situational Awareness (SA) for Battalion and below, particularly for dismounted soldiers. One of the key attributes of this change was to introduce a lower data classification level, Secure But Unclassified (SBU), for lower echelon Army units. For addressing the different technical aspects of this use case, assume the unit type is an Infantry Brigade Combat Team (IBCT).

AR 605.  This excerpt—the only portion of the RFP to mention Capability Set 21— does not direct offerors to, or even suggest that offerors should, limit proposals to the components of Capability Set 21.  In fact, contrary to Bowhead's reading, the Army introduced the above-quoted provision by inviting contractors to address any systems they believed could become relevant during contract performance.  *Id.* ("Offerors shall describe their understanding and usage of systems of systems as it pertains to the Army's Tactical Network. For your response, address *any subsystems* believed to be required to support interoperability for warfighting functions." (emphasis added)).

---

[21] According to the U.S. Army website:

> A Capability Set (CS) is a tool kit of applications and hardware that allows Soldiers to connect to the Army's mobile tactical network. Capability Sets provide the real-time information and mobile network hotspot connectivity that Soldiers need to plan and execute their missions, from the command post to the tactical vehicle to the dismounted rifleman.

*Capability Set 14*, STAND-TO! (July 23, 2014), available at https://perma.cc/2VXB-7M97.  The number in the title corresponds with the updated version of the tool kit.  The U.S. Army Acquisition Support Center further explains:

> The Army uses its two-year incremental capability set process to execute network modernization across the force while keeping pace with technology advancements and emerging threats. Each capability set builds off the previous and is infused with commercial solutions informed by Soldier touch points, global experimentation, and developmental and operational tests that are synchronized and combined for maximum efficiency and effectiveness.

Amy Walker, *Future Operating Environment, Strategic Need Fuel Army's Network Design Goals*, U.S. ARMY ACQUISITION SUPPORT CTR., at 2 (May 4, 2023), available at https://perma.cc/B9QH-4ZHF.

The RFP further explained that, for Technical Factor 1, the Army would "evaluate[] the offeror's proposed ability to tackle Systems of Systems Technical Challenges associated with performance of Task Order 0001 for the base period *and all option years*." AR 619 (emphasis modified). During the three-year period contemplated by Task Order 0001, the Army planned to implement at least one additional capability set (i.e., Capability Set 23).[22] Accordingly, the Army neither violated the terms of the RFP nor relied on unstated evaluation criteria in crediting DNI's inclusion of Capability Set 23. *See Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 387 (2003) ("[I]t is well-settled that 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.'") (first quoting *Analytical & Rsch. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 45 (1997); then citing *Comput. Scis. Corp. v. United States*, 51 Fed. Cl. 297, 309 (2002); then citing *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed. Cl. 303, 321 (2000); and then citing *T&S Prods., Inc. v. United States*, 48 Fed. Cl. 100, 105 (2000)), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004), *quoted in Saliense Consulting LLC v. United States*, 176 Fed. Cl. 803, 817 (2025).

Bowhead next challenges its "acceptable" rating—as opposed to the "good" rating DNI received—for Technical Factor 1. In support, Bowhead cites the Army's assignment of three strengths and no weaknesses to Bowhead's proposal under this factor and the relevant adjectival definitions included in the solicitation. The cited definitions, however, do not compel resolution of this issue in Bowhead's favor:

| Rating | Description |
|---|---|
| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |

AR 621. In evaluating Bowhead's proposal, the SSA explained that Bowhead's approach to and understanding of the SEPM contract requirements did not reach the level of thoroughness required for the assignment of a "good" rating:

> When compared to [DNI] and [another member of the competitive range], although [Bowhead] had strengths in their technical demonstration of knowledge, the strengths did not elevate the offeror[']s approach and understanding of the requirements to the thorough threshold required for Good rating. In addition, unlike [DNI] and [the other member of the competitive range], [Bowhead]'s demonstration of

---

[22] *See* Walker, *supra* note 21, at 3 ("The Army's network community works on several capability sets at a time. While currently fielding CS-23, the Army is simultaneously prototyping and experimenting for CS-25, and maturing science and technology (S&T) efforts for CS-27 and beyond.").

knowledge with respect to the [Planning, Programming, Budget, and Execution (PPBE)] process was only adequate while [DNI] and [the other member of the competitive range] received strengths for the same.

AR 4216.  Bowhead's mere disagreement with where the SSA ultimately landed in assigning an adjectival technical rating does not warrant second-guessing the rating.[23]  *Allicent Tech., LLC v. United States*, 166 Fed. Cl. 77, 138 (2023) (quoting *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)); *accord EFW, Inc. v. United States*, 148 Fed. Cl. 396, 409 (2020) (rejecting protester's challenge to an agency's technical evaluation where the protester "conflate[d] the RFP's . . . qualitative approach with a quantitative one" by engaging in a "simple count of strengths and weaknesses") (first quoting *N.S. Consulting Grp., LLC v. United States*, 141 Fed. Cl. 549, 557 (2019); and then citing *McConnell Jones Lanier & Murphy LLP v. United States*, 128 Fed. Cl. 218, 231 (2016)).

Relatedly, Bowhead fails to convincingly argue that the Army erred in not raising the above-quoted assessment of the offeror's approach and understanding of the contract requirements during discussions.  "[D]iscussions[] between an agency and offerors must be fair and meaningful."  *Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 661 (2023) (citing *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 715–17 (2011)).  Under this FAR-based standard, "[d]iscussions should generally 'address weaknesses or deficiencies in an offeror's proposal that, unless corrected, would preclude award.'"  *Id.* (quoting *Patriot Taxiway Indus. v. United States*, 98 Fed. Cl. 575, 587–88 (2011)).  Critical here, however, "[t]he government 'need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others.'"  *Id.* (quoting *Acra, Inc. v. United States*, 44 Fed. Cl. 288, 295 (1999)).  The form and substance of these discussions, moreover, necessarily fall within the contracting officer's sound discretion.[24]

---

[23] Bowhead's focus on the level of identified risk clause included in the above-captured adjectival ratings definitions is misplaced given the conjunctive nature of the documented standard.  To find otherwise would ignore the Army's concurrent use of the disjunctive "and/or"—as opposed to the conjunctive "and"—in defining the comparative "marginal" and "unacceptable" ratings.  *See* AR 621.

[24] Consistent with the foregoing, FAR 15.306 provides, in part:

At a minimum, the contracting officer must[] . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(3).

The Army satisfied any reasonable interpretation of these requirements. As detailed above, in inviting Bowhead to participate in discussions, the Army issued two Evaluation Notices (including one for Technical Factor 1) and provided Bowhead with an opportunity to respond to the identified weaknesses. The record presented does not support Bowhead's claim that the Army considered the comparative level of detail included in the offeror's proposal an additional weakness, requiring notice and an opportunity to respond or cure. The Army assessed Bowhead with strengths for its understanding of certain networks, including the ITN, the tactical scalable mobile ad hoc networking (TSM), and the Barrage Relay network. Put simply, the level of detail included in Bowhead's proposal was not considered a disqualifying weakness; rather, the Army found it comparatively less thorough than the proposals of two other competitive range members, including DNI. Accordingly, the Army was not required to engage in discussions with Bowhead on this issue in an effort to boost Bowhead's chances of contract award.

Bowhead next charges that the Army's evolving assessment of the offeror's proposal for Technical Factor 1 did not align with the final adjectival rating assigned. The initial evaluation report prepared by the SSEB documented three strengths and one weakness, the latter relating to the PPEB section: "the Offeror did not fully demonstrate knowledge of working with or using the financial systems required for execution of funding." AR 2196. Notwithstanding the cited weakness, the SSEB concluded that Bowhead's proposal met the adjectival definition of "acceptable." After issuing an Evaluation Notice and completing discussions, as memorialized in the final evaluation report, the SSEB concluded that the identified weakness was "adequately resolved." AR 4000. Nevertheless, the SSEB renewed its "acceptable" rating, citing the limited detail included in Bowhead's proposal:

> The proposal, even with the three strengths received, was adequate and not thorough. The Offeror did not provide thorough detail for the technologies (ITN, TSM, etc.). The proposal is rated ACCEPTABLE as it indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is low.

AR 4001. As quoted *supra*, in adopting the SSEB's assignment of an overall "adequate" rating for Factor 1, the SSA independently cited Bowhead's inferior approach to and understanding of the SEPM contract requirements when compared to other members of the competitive range, including DNI. The Court struggles to find an actionable disconnect.[25]

---

[25] For example, Bowhead notes that the SSEB's final evaluation report assigned a strength for "[t]he Offeror's thorough explanation and details on systems that are part of the ITN," AR 3999, but then retained the "acceptable" rating for Technical Factor 1 based, in part, on its finding that "[t]he Offeror did not provide thorough detail for the technologies (ITN, TSM, etc.)." AR 4001. To the extent these evaluative statements are inherently contradictory, they do not control the outcome of the contract award or this case. As the ultimate decisionmaker, although the SSA must consider the SSEB's

The resolution of the singular weakness initially identified in Bowhead's proposal did not require the Army to upgrade the adjectival rating assigned for Technical Factor 1 from "adequate" to "good." This is particularly true where, as here, the SSA found that two other members of the competitive range presented superior technical proposals meriting the higher adjectival rating. In short, the SSA sufficiently explained that Bowhead's descriptions of the relevant technical systems were adequately thorough but fell comparatively short of thoroughly good.

### B. Technical Factor 2

Bowhead's challenge under Technical Factor 2 (Technical Readiness) is limited to the Army's evaluation of DNI's proposal and, more specifically, the Army's alleged failure to assign DNI a deficiency for subfactor 1 (program management plan).[26] In support, Bowhead relies on the following excerpt from the SSEB evaluation: "[DNI] fails to address their methodology to ensure rates are competitive and reasonable." AR 4053. Bowhead argues that DNI's reported failure runs afoul of the solicitation, which requires: "At a minimum, the proposed methodology must address . . . [c]ost control, addressing rate discipline and methods to ensure costs are competitive and reasonable."[27] AR 606.

Read in context, including the complete sentence of the highlighted excerpt, the SSEB evaluation report states:

> [DNI]'s proposed method to control costs meets the requirement of . . . Cost Control, addressing rate discipline and methods to ensure costs are competitive and reasonable. . . . Although [DNI] explains in detail their plan to monitor costs, which meets the requirements for cost control, the offeror fails to address their methodology to ensure rates are competitive and reasonable.

---

findings and recommendations, the SSA is not bound by them. *Firstline Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 382 (2011) ("While the SSEB plays an important role in the source selection process, it is the SSA that is ultimately responsible for selecting the proposal that represents the best value to the government.") (citing 48 C.F.R. § 15.303(b)(6)); *cf. WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1380 (Fed. Cir. 2020) ("Because the SSA had the full authority to award the contract to [one offeror over another], we need not be concerned with errors in the interim reports by the [Technical Evaluation Team (TET)] or SSAC unless they were carried forward to the SSA's final decision.").

[26] The RFP defines a deficiency as: "A material failure of a proposal to meet a Government requirement or a combination of weaknesses in a proposal that increase the risk of unsuccessful performance to an unacceptable level." AR 4052.

[27] Bowhead also claims DNI's Technical Factor 2 proposal deserved a rating of either "marginal" or "unacceptable" because the proposed low cost presented a high risk that DNI would not be able to hire, recruit, or retain the required personnel. This issue is addressed *infra* Section III.D.

AR 4053. Any conflict or inconsistency in the SSEB evaluation report on this issue was supplanted by the controlling SSA conclusion that all four members of the competitive range, including DNI, "fully addressed" the Technical Factor 2, subfactor 1 requirements. AR 4218; *see Firstline Transp.*, 100 Fed. Cl. at 382; *cf. WellPoint*, 953 F.3d at 1380. Indeed, rather than question the adequacy of DNI's proposal, the SSA noted that DNI—as well as Bowhead and a third member of the competitive range—"provided further details within each area of their program management plans that are considered advantageous to the government during contract performance."[28] AR 4218.

Bowhead's contention is further undermined by Section 2.1.5 of DNI's Program Management Plan, titled "Approach to Cost Control." AR 3332–34. The proposal includes references to specific programs and practices, tools and techniques, and policies and processes to continuously monitor, evaluate, and calibrate staffing, scheduling, expenditures, and performance. According to DNI, their business plan and effort would minimize risk, realize efficiencies, control costs, and exceed contract requirements. Such representations, no matter their degree of accuracy or ultimate realization, fall within the ambit of a contractor "address[ing] their methodology to ensure rates are competitive and reasonable." AR 4053. Accordingly, this Court will not disturb the SSA's conclusion that DNI satisfied the requirements for cost control as specified in the RFP. *See, e.g.*, *ViON Corp. v. United States*, 122 Fed. Cl. 559, 572 (2015); *PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 342–43 (2010) (quoting *Nucor Corp. v. United States*, 414 F.3d 1331, 1341 (Fed. Cir. 2005) ("[J]udicial review of an agency's findings does not demand expansive discussion or rigid adherence to a specific formula, as long as the court can determine that the statutory requirements have been satisfied.")).

### C. Past Performance

Bowhead alleges multiple errors in the Army's past performance evaluations. The incumbent contractor first claims the Army should have credited Bowhead with a "substantial confidence" rating for its successful performance of the legacy SEPM contract. More specifically, Bowhead faults the Army for not considering Bowhead's and its designated subcontractors' experience in the aggregate and further failing to appreciate the full value of the incumbent's performance under the legacy contract. Bowhead separately argues that DNI deserved a "neutral confidence" rating because the designated awardee relied exclusively on the past performance examples of one of its proposed subcontractors. Bowhead fails to demonstrate by preponderant evidence that the Army had no rational basis for either performance rating assigned.

---

[28] The SSA further noted his agreement with the SSAC's confirmation that DNI's proposal be assigned an overall rating of "good" for Technical Factor 2, subfactor 1, reflective of one strength and no weaknesses, significant weaknesses, or deficiencies. AR 4053.

*See STG Int'l, Inc. v. United States*, 165 Fed. Cl. 577, 586 (2023) (citing *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003)).

"[This Court] will not upset the agency's rating simply because plaintiff was the incumbent and believes its experience to be superior." *United Concordia Cos. v. United States*, 99 Fed. Cl. 34, 45 (2011) (citation omitted), *quoted in Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 492 (2022) ("[Agency] may not award [a contractor] strengths due to its incumbent status because the [request for quotes (RFQ)] does not disclose any advantage related to incumbency.") (citing *Sys. Studies & Simulation, Inc. v. United States*, 152 Fed. Cl. 74, 88 (2020), *aff'd*, 22 F.4th 994 (Fed. Cir. 2021)). With regard to the aggregation issue raised by Bowhead, the RFP provided in relevant part: "If an offeror submits past performance information for an [indefinite delivery/indefinite quantity (ID/IQ)] and/or [blanket purchase agreement (BPA)] contract, then the offeror must identify a specific [Task Order] under that specific ID/IQ and/or BPA contract." AR 609. The RFP also noted that "[t]he [Army] will focus its inquiries on the offeror's (and major subcontractor's) record of performance as it relates to all solicitation requirements, including cost, schedule, performance, and management of subcontractors." AR 621. The RFP further spoke to the information the Army could—but was not required to—consider while evaluating past performance:

> The [Army] may use data provided by the offeror in its proposal and data obtained from other sources, including data in Government files or data obtained through interviews with personnel familiar with the contractor and their current and past performance under Federal, State or Local government or commercial contracts for [the] same or similar services . . . .
>
>       . . . The Government may consider a wide array of information from a variety of sources but is not compelled to rely on all of the information available.

AR 622.[29] Absent a stated requirement to consider the past performance experiences of an offeror and their designated subcontractors in the aggregate, the Army's claimed

---

[29] The Army's past performance analyses were confined to the consideration of three factors: "recency, relevancy (including context of data), and quality (including general trends in contractor performance and source of information)." AR 621. The RFP did not direct the Army to assess the three factors holistically or otherwise consider additional factors. *See* AR 623 (basing performance confidence assessment ratings on "recent/relevant performance record[s]" to the extent such records were available).

failure to engage in that exercise cannot be construed as lacking a rational basis or otherwise arbitrary, capricious, an abuse of discretion, or contrary to law.[30]

In a tacit acknowledgment of the foregoing, Bowhead invokes the "too close at hand" doctrine to suggest that the Army should have considered the full value of the incumbent's performance under the legacy contract. Under this principle, "[i]t is well-established that 'some information is simply too close at hand to require offerors to shoulder the inequities that spring from an agency's failure to obtain, and consider, the information.'" *KACE Co. v. United States*, 167 Fed. Cl. 192, 208 (2023) (quoting *Insight Pub. Sector, Inc. v. United States*, 157 Fed. Cl. 398, 410 (2021)). There is a stark difference, however, between an agency's failure to *consider* readily available information and an agency's disputed *appreciation* of that data. Here, the Army duly considered Bowhead's and its designated major subcontractors' relative experience under the legacy contract in assigning an overall "satisfactory confidence" rating for the SEPM solicitation (e.g., distinguishing size, scope, role, level of effort, location, value). AR 4096–107 ("[Bowhead] is currently a subcontractor . . . on the active [PEO C3N SEPM] contract."). Bowhead thus fails to demonstrate that the Army violated the "too close at hand" doctrine in evaluating the incumbent contractor's past performance. *See, e.g.*, *ProSecure, LLC v. United States*, 151 Fed. Cl. 697, 707 (2020).

Bowhead's challenge to DNI's comparable past performance rating fares no better. The RFP states, in relevant part:

> The Offeror shall submit no more than five recent and relevant Government and/or commercial contracts for the [Army] to assess the Offeror's probability of meeting solicitation and PWS requirements based on a demonstrated record of performance. Of these five recent and relevant Government and/or commercial contracts that the Offeror may submit, no more than two may be from the proposed significant subcontractors/significant teaming partners.

AR 608. In compliance with the literal terms of this provision, DNI submitted two past performance examples from a proposed significant subcontractor.[31] The solicitation did not require offerors to submit any examples of their own past

---

[30] Had the drafters of the RFP intended the Army to consider past performance submissions in the aggregate, they could have so required. *See, e.g.*, *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 591 (2017) ("In both evaluations, the experience of the prime contractor offeror and its major subcontractors was to be considered 'in the aggregate' to determine relevance or similarity to the requirements being procured.").

[31] DNI also submitted three past performance examples of its tribal affiliates that the Army declined to consider. The SSEB reported that DNI "failed to explain how it would bring the resources of its tribal affiliates to bear on performance of the current requirement." AR 4189. The SSA, in turn, noted that the two tribal affiliates were "not identified major subcontractors." AR 4221.

performance.[32]  Accordingly, DNI's past performance submission is not deficient or otherwise contrary to the express requirements of the solicitation.[33]

The Court similarly declines to reevaluate the subjective assessments and weight the Army accorded DNI's past performance submissions.  The SSEB and SSA examined the recency, relevance, and recorded history of the proffered past performance examples of DNI's major subcontractor in documenting their assignment of a "satisfactory confidence" rating.  In fact, notwithstanding Bowhead's incumbent status, the Army determined that DNI edged Bowhead out for the strongest past performance proposal.  Although curious, as related in the administrative record, the subjective evaluations are not without rational basis (i.e., comparative evaluation of size, scope, role, effort, complexities).  As such, they will not be disturbed.  "[E]valuation of past performance is a matter within the discretion of the contracting agency[,] and . . . the 'agency's reasonable interpretation of the facts is entitled to considerable deference.'"  *Taahut v. United States*, 849 F. App'x 260, 266 (Fed. Cir. 2021) (quoting *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 910 (Fed. Cir. 2013)); *accord CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 748 (2021) (collecting cases); *Enhanced Veterans*, 131 Fed. Cl. at 592 ("[Where] the agency adequately explained the basis for finding the experience relevant, . . . 'the great deference and discretion an agency is given to determine the relevance and quality of an offeror's past performance will not allow this aspect of the evaluation to be disturbed.'") (quoting *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 259 (2011)).

### D.  Cost Realism

Bowhead charges that the Army's cost realism analysis of DNI's proposal was incomplete, inaccurate, and improperly limited.  Where, as here, the government solicits services on a cost-reimbursement basis, the FAR requires the procuring agency to perform a cost realism analysis for each offeror's proposal.  48 C.F.R. § 15.404-1(d)(2).  "In essence, a cost realism analysis determines whether a proposed

---

[32] As noted with regard to the aggregation issue, had the drafters of the RFP intended offerors to include at least one example of their own prior performance, they could have so required. *See, e.g., Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 489 (2018) ("Although offerors were allowed to include past efforts of their major subcontractors, the Solicitation stated that '[d]ata concerning the prime quoter shall be provided first, followed by each proposed major subcontractor, if applicable, in alphabetical order.' . . . The Solicitation clarified[] . . . that 'in this assessment, the [agency] will consider past performance for the proposed prime [c]ontractor . . . to be significantly more important than past performance examples submitted for any other member of the vendor's proposed structure.'" (certain alterations in original)).

[33] Any challenge to the solicitation requirements is waived in this post-award bid protest. *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) ("A bidder that challenges the terms of a solicitation in the Court of Federal Claims generally must demonstrate that it objected to those terms 'prior to the close of the bidding process.' If it cannot do so, the bidder 'waives its ability to raise the same objection afterwards in a § 1491(b) action.'") (quoting *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007)).

cost is too low and thereby increases the risk of overcharging."[34] *Warrior Focused Sols., LLC v. United States*, 175 Fed. Cl. 416, 432 (2025) (first citing *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1305 (Fed Cir. 2021); and then citing *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1384 (Fed. Cir. 2020)). "[A]n agency need not perform the analysis with impeccable rigor to be rational. Rather, the cost realism analysis must reflect that the agency considered the information available and did not make irrational assumptions or critical miscalculations." *Id.* (first quoting *Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 260 (2015); and then citing *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000)). Accordingly, the scope of the Court's review "is very narrow." *McConnell Jones*, 128 Fed. Cl. at 236.

The SEPM solicitation required the Army to conduct a cost realism analysis of each proposal consistent with the evaluation criteria codified in FAR 15.404-1. Rather than specify a particular methodology, however, the FAR allows procuring agencies to "use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition." 48 C.F.R. § 15.404-1(c)(2), *quoted in Agile*, 959 F.3d at 1385–86 (discussing FAR 15.404-1(c)(2) in the context of the "wide latitude" enjoyed by procuring agencies while conducting a cost realism analysis). These include verifying and assessing costs and pricing data; evaluating the potential impact of an offeror's current practices on future costs; comparing proposed costs with historical trends, estimates, and forecasts; ensuring compliance with Cost Accounting Standards; and ensuring all critical cost data is complete. 48 C.F.R. § 15.404-1(c)(2).

Challenging the completeness of the cost realism analysis performed on DNI's proposal, Bowhead cites the Army's focus on the proffered labor rates of only the prime contractor—which accounted for just over one third of the total labor categories proposed (i.e., 17 of 48). By ignoring the labor rates of DNI's subcontractors, Bowhead posits the Army failed to perform the required due diligence. This argument is not supported by the RFP and fails for the additional reason that the Army subjected Bowhead's proposal to the same level of scrutiny.[35]

---

[34] The FAR describes cost realism analysis as:

> [T]he process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

48 C.F.R. § 15.404-1(d)(1).

[35] Bowhead's reliance upon *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502 (2003), and *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588 (2023), is misplaced. The readily distinguishable operative fact in both cases was that the procuring agency failed to perform any cost analysis. *See Al Ghanim*, 56 Fed. Cl. at 513 ("The administrative record[] . . . reveals that the

The SEPM solicitation generally required offerors to "provide whatever information is necessary to help the Government understand why the proposed costs are realistic . . . ." AR 611 (emphasis omitted). The same data call was pronounced for any proposed cost-reimbursement subcontractors. Specific to labor costs, the solicitation directed offerors to include in their cost proposal "all proposed labor categories and hours for the prime and its subcontractor efforts regardless of the contractual relationship between the prime and subcontractor . . . ."[36] AR 611. Under "Travel and Other Direct Costs," the solicitation instructed offerors to provide "supporting cost information" to justify their "labor rate pricing." AR 612–13. The RFP then provided a list of optional data submissions for proposed direct labor rates for the "Offeror and its subcontractor(s)." AR 613. Relevant to DNI's proposal, the instructions noted: "If using salary survey data to support direct labor rates, the Offeror should not propose any direct labor rates below the 50th percentile for any labor. Proposed rates below those percentiles may be found unrealistic." AR 614.

Nothing in the RFP commits the Army to evaluate the labor rates proposed for a specific number or type of labor categories in the performance of the required cost realism analysis. For both DNI *and Bowhead*, the Army limited its labor-rate analysis to the prime contractor's direct labor categories. Although evaluators could have dived deeper into the proposed labor rates—to include those of designated subcontractors—there was no requirement to do so.[37] Stated differently, the line drawn at the prime contractor level did not run afoul of the stated rules of evaluative engagement. As such, it cannot be second guessed.[38] *See Warrior Focused*,

---

[agency] performed no cost analysis whatsoever."); *DigiFlight, Inc.*, 165 Fed. Cl. at 603 ("Simply put, it was unreasonable for the agency to conclude, based on level of effort and labor mix alone (without considering price), that that [sic] all three offerors' proposed prices were realistic, . . . .").

[36] Referenced examples included firm-fixed price, time and materials, and cost-plus-fixed fee. Offerors were further directed to specify the contractual relationship between the prime and all subcontractors.

[37] Although immaterial to the Court's decision, the Army did review subcontractor rates for another offeror in the competitive range. *Compare, e.g.*, AR 875 (proposing rate for the "financial analyst, junior" category that would be performed exclusively by one of Offeror A's subcontractors), *with* AR 4134 (analyzing the "financial analyst, junior" labor category in the cost realism analysis of Offeror A's proposal).

[38] The Court similarly rejects Bowhead's criticism of the Army's reliance upon direct-labor-rate data from the U.S. Bureau of Labor Statistics. Put simply, the solicitation specifically authorized it. AR 610 ("The Government may use external sources of information in performing its cost evaluation to include, but not limited to, *Bureau of Labor Statistics*, Department of Labor, Department of State, DCAA or DCMA." (emphasis added)). Although Bowhead takes issue with the specific BLS labor classifications chosen by DNI and relied upon by the Army, mere disagreement with the Army's implicit conclusion about the relevance of the BLS labor classifications does not, on its own, render the Army's choice to rely on them arbitrary and capricious. *See Warrior Focused*, 175 Fed. Cl. at 434. This is particularly true where, as here, supporting salary survey data was merely intended to serve as a reference point below which proposed labor rates could—but were not required to—be deemed unrealistic. AR 614 ("Proposed rates below [the fiftieth] percentiles *may* be found unrealistic." (emphasis added)).

175 Fed. Cl. at 434 ("It is well-established that mere disagreements with an agency's methodology do not constitute grounds for overturning a cost realism analysis.").

The Army's cost realism analysis, however, was not without error. Specifically, the cost evaluator's statement that DNI's proposed labor rates met or exceeded the fiftieth percentile of the salary survey data as required by the solicitation—undisturbed by the SSA—is contradicted by the record. For nine of the seventeen labor categories reviewed by the Army, DNI proposed direct labor rates below the fiftieth percentile of the salary survey data.[39] The deltas range from $730 (per {redacted}) to $27,250 (per {redacted}) for the base year of the SEPM contract. Assuming the Army would have adjusted DNI's proposed cost upwards to account for those gaps, DNI's final cost would have increased by $561,265.96.[40]

| Position | DNI Rate | BLS (50%) | Delta: Base Year | Delta: Year 2 | Delta: Year 3 | Total |
|---|---|---|---|---|---|---|
| Communication Specialist, Junior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Human Resources Administrative Assistant, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Program Analyst, Senior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Program Specialist, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Computer Systems Analyst, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Database Architect, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Telecommunications Specialist, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Web Application Developer, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Maintenance Supervisor | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
|  |  |  |  |  |  |  |
| Total |  |  | $171,400.00 | $192,627.00 | $197,238.96 | $561,265.96 |

If, as Bowhead asserts is required, all proposed labor rates are examined—including those of DNI's subcontractors—a total of twenty-two of the forty-eight labor categories proposed by DNI fall below the fiftieth percentile of the salary survey data. For the base year, the deltas similarly range from $730 (per {redacted}) to $27,250

[39] DNI initially proposed labor rates largely consistent with salary survey data from May 2022: only five fell below the fiftieth percentile and did so by margins ranging from $10 to $40. In response to an Evaluation Notice, DNI revised its cost proposal to provide updated salary survey data from May 2023, but did not update their proposed labor rates accordingly.

[40] The upward adjustment accounts for the base year and two option years in Task Order 0001, DNI's proposed 2.00% annual salary increase for each labor category, and the amount of full-time equivalent employees DNI proposed for each labor category. By way of example, for the {redacted}, DNI's proposed rate for the base year was $730 lower than the fiftieth-percentile BLS rate for the corresponding labor category. Accounting for the 2.00% annual salary increase, and rounding to the nearest penny, the additional cost would increase to $744.60 per employee in the first option year and $759.49 per employee in the second option year. DNI proposed employing {redacted} in the base year and then adding {redacted} each option year. The total additional cost for this labor category for the three-year period is $73,754.46.

(per {redacted}) for the base year of the SEPM contract.  If the Army adjusted DNI's proposed cost upwards to account for the variances, DNI's final cost would have increased by \$1,207,329.  *See* Appendix A.    The Court's calculated cost realism adjustment would raise DNI's cost proposal to \$69,524,735, which, in turn, would reduce the gap between DNI's and Bowhead's cost proposals from \$12,679,874 to \$11,472,545.[41]

Even assuming the Court were to find that the Army erred in not considering the complete universe of labor rates proposed by DNI falling below the fiftieth percentile,[42] Bowhead cannot establish the requisite materiality or prejudice warranting relief.  Some of DNI's proposed labor rates were only slightly lower than the fiftieth percentile.[43]    Those gaps—on their own—would have had a de minimis impact on the Army's final decision.  *See Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement. '[O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations.'") (first citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 960 (Fed. Cir. 1993); then quoting *Andersen Consulting*, 959 F.2d at 932; then citing *SMS Data Prods. Grp., Inc. v. United States*, 900 F.2d 1553, 1557 (Fed. Cir. 1990); and then citing *Excavation Constr., Inc. v. United States*, 494 F.2d 1289, 1293 (Ct. Cl. 1974)); *cf. Off. Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020) ("Even if the [agency] awarded [the protester] the additional 6 points it afforded to the awardee, [the protestor]'s technical score would only increase to 18 points, well below the acceptable 40-point threshold for award.").  This finding is consistent with the RFP's permissive language: "Proposed rates below [the fiftieth] percentiles *may* be found unrealistic."  AR 614 (emphasis added).  Thus, in proposing certain direct labor rates below the fiftieth percentile, DNI risked—but did not compel—a finding that they were unrealistic under the express terms of the solicitation.

Moreover, to the extent any of the margins between DNI's proposed labor rates and the fiftieth-percentile BLS rates were not insignificant, Bowhead still cannot demonstrate prejudice.  *See JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002) ("To prevail in its bid protest, [plaintiff] must additionally show that any significant error in the procurement process prejudiced the award.") (citing *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).  To succeed on this issue, the disappointed bidder must show that "there was a 'substantial chance

---

[41] Limiting this calculation to the DNI-only labor categories captured above, DNI's proposed cost would increase by \$561,266, from \$68,317,406 to \$68,878,672.  Under this scenario, the gap between DNI's and Bowhead's cost proposals would be \$12,118,608.

[42] As discussed *supra*, the solicitation did not require the Army to evaluate the proposed labor rates of designated subcontractors.

[43] For example, DNI's proposed labor rate for the {redacted} was only \$1,130 (or 1.08%) lower than the fiftieth-percentile BLS rate.

it would have received the contract award but for that error.'" *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting *Statistica*, 102 F.3d at 1582). "This test is more lenient than showing actual causation," but "the protestor must do more than show a 'mere possibility' that but for the agency errors, it 'would have received the contract.'" *AM Gen., LLC v. United States*, 115 Fed. Cl. 653, 702 (2014) (first quoting *Bannum*, 404 F.3d at 1358; and then quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996)).

The specified remedy for proposed costs found unrealistically low was an upward adjustment: "As part of the realism analysis, the Government will calculate an evaluated cost by adjusting each Offeror's proposed cost to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis." AR 623–24. As calculated above, employing the maximum cost realism adjustment, Bowhead's proffered costs still exceeded DNI's adjusted costs by more than $11 million on a roughly $70 million procurement.[44] Having presented the superior Technical Factor 1 proposal and stronger past performance examples, DNI's significantly lower cost proposal—even adjusted—undermines any credible argument that Bowhead had a substantial chance of award but for the Army's flawed cost realism analysis. Simply put, the cited error was harmless. *Cf. JWK Int'l*, 279 F.3d at 988–89 (awardee's technological and management superiority outweighed marginal difference in cost proposals); *United Payors & United Providers Health Servs., Inc. v. United States*, 55 Fed. Cl. 323, 331–32 (2003) (flawed cost realism analysis evidenced prejudice where margin between protester's and awardee's cost proposal was "relatively narrow").

Next, Bowhead maintains that the Army failed to account for the impact of DNI's cost proposal on its technical proposal and ratings. The RFP outlined the intended import of the cost realism analysis:

> Cost Realism Evaluation: The results of the cost realism evaluation will determine the probable cost of performance as it relates to the technical approach proposed by each Offeror and will be utilized in the selection of the offer that provides the best value to the Government. As part of the realism analysis, the Government will calculate an evaluated cost by adjusting each Offeror's proposed cost to reflect any additions or reductions in cost elements to realistic levels based on the results of the cost realism analysis. The evaluated cost may differ from the proposed cost and will reflect the Government's best estimate of the cost that is most likely to result from the Offeror's proposal. If the total evaluated cost is higher than the proposed, the evaluated becomes the probable

---

[44] Of note, DNI's adjusted cost proposal was on par with all members of the competitive range save outlier Bowhead.

> cost. If the total evaluated cost is lower than the proposed, the proposed becomes the probable cost.

AR 623–24. Bowhead's argument focuses on the reference to the technical assessment included in the first sentence: "The results of the cost realism evaluation will determine the probable cost of performance *as it relates to the technical approach proposed by each Offeror . . . .*" AR 623 (emphasis added). Bowhead also points to the RFP's express reference to FAR 15.404-1, which explains that cost realism analyses must determine, among other things, "whether the estimated proposed cost elements are . . . consistent with the unique methods of performance and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404-1(d)(1).[45]

Bowhead's argument fails for at least two reasons. First, the Army made clear that the technical proposals would be evaluated independently from the cost proposals.[46] *See, e.g.*, AR 599 ("Cost information shall not appear in the Technical proposal. Proposals that fail to separate cost information from the Technical proposal may not be considered for award."). Although the RFP explained that the cost realism analyses would "determine the probable cost of performance *as it relates to* the technical approach proposed by each Offeror," it did not conversely mandate that the technical evaluations involve reviews of each offeror's technical proposal as it relates to that offeror's cost proposal. *Compare* AR 623 (emphasis added), *with* AR 619–21. Second, cost/price was the least important factor to be considered in the award decision. In fact, it was a distant fourth. AR 617 ("Technical Factors 1 and 2 are equally important. When combined, the two technical factors are significantly more important than Cost/Price and Past Performance combined. Past Performance is significantly more important than Cost/Price."). To overlay or otherwise equate the evaluations of technical and cost proposals would run afoul of the express terms of the RFP. *See Culmen Int'l, LLC v. United States*, No. 25-34, 2025 WL 1145275, at *7 (Fed. Cl. Apr. 15, 2025) ("The Solicitation[] . . . did not permit the cost realism analysis to inform or affect the evaluation of the Technical Factor. The Solicitation clearly split up the evaluation factors advising that each volume be dedicated to its particular factor as well as indicating that there would be no cross-referencing between the volumes during the evaluation. . . . By keeping the evaluation of these different factors separate, the Agency ensured independent analysis of each factor.").[47] Each serves its intended purpose: technical evaluators assess the

---

[45] Bowhead also cites FAR 15.305: "When contracting on a cost-reimbursement basis, evaluations shall include a cost realism analysis to determine what the Government should realistically expect to pay for the proposed effort, the offeror's understanding of the work, and the offeror's ability to perform the contract." 48 C.F.R. § 15.305(a)(1).

[46] Indeed, the Source Selection Plan tasked two different teams with evaluating cost/price and technical proposals.

[47] Bowhead emphasizes the conjunctive nature of FAR 15.404-1(d)(1), which explains that agencies conduct cost realism analyses "to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; *and* are

adequacy of, for example, an offeror's staffing approach; cost evaluators, in turn, determine whether the proposed cost attributed to that staffing approach is realistic. *See CSC Gov't Sols. LLC v. United States*, 129 Fed. Cl. 416, 434 (2016).

### E. Best-Value

Bowhead's challenge to the Army's best-value decision is premised upon the cumulative impact of the claimed errors, all but one of which the Court rejects. The singular confirmed error relates to a subset of direct labor costs. But that error does not undermine the Army's best-value determination or otherwise render it arbitrary or irrational. *See, e.g.*, *AM Gen.*, 115 Fed. Cl. at 700 ("The agency's consideration of the past performance of [an offeror's] subcontractors was contrary to the solicitation criteria and thus constituted error. This error, however, does not render the tradeoff analysis irrational, or arbitrary."). This is true particularly where, as here, cost was the least important factor.

### F. Injunctive Relief

"To grant injunctive relief, the Court must consider whether: (1) plaintiff has succeeded on the merits of the case; (2) plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by granting injunctive relief." *Clean Team*, 171 Fed. Cl. at 12–13 (citing *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 418 (2022) (citing *Centech*, 554 F.3d at 1037)). As the party seeking this relief, Bowhead bears the burden of proof. *Id.* (citing *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 n.13 (Fed. Cir. 2018)). The assessment of the injunctive relief factors in this case begins— and ends—with Bowhead's failure to prevail on the merits. *See id.* ("Success on the merits carries 'great weight' in determining whether injunctive relief is appropriate. It necessarily follows that a protestor's inability to make this showing 'precludes the possibility of an injunction.'") (first quoting *Dell*, 906 F.3d at 999 n.13; and then citing

---

consistent with the unique methods of performance and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404-1(d)(1) (emphasis added). The RFP's general reference to FAR 15.404-1, however, does not supersede its express instructions to consider technical proposals separately from cost proposals. *Cf. Culmen Int'l*, 2025 WL 1145275, at *3, *7 (holding that "[i]t would have . . . been inconsistent with the Solicitation to carry cost information from [the cost/price volume] and apply it to [the technical volume]," even though the solicitation instructed the agency to "evaluate the 'realism' of the proposed costs by assessing whether the proposed costs '. . . are consistent with the unique methods of performance and materials described in the Offeror's Technical section'"). Put differently, the general instruction in FAR § 15.404-1 to determine whether an offeror's proposed cost is consistent with the offeror's technical proposal does not, on its own, "permit the cost realism analysis to inform or affect the evaluation of the Technical Factor"—particularly where, as here, language in the RFP suggests the agency should consider technical submissions separately from cost submissions. *Cf. Culmen Int'l*, 2025 WL 1145275, at *7–8.

*Aircraft Charter Sols., Inc. v. United States*, 109 Fed. Cl. 398, 416 (2013) ("[W]ithout success on the merits, the injunctive relief inquiry is over.")).

## CONCLUSION

For these reasons, plaintiff's motion for judgment on the administrative record (ECF 55) is DENIED and defendant's and defendant-intervenor's cross-motions for judgment on the administrative record (ECF 56, 57) are GRANTED.  The Clerk of Court is directed to enter judgment accordingly.  No costs.

It is so **ORDERED**.

Armando O. Bonilla
Judge

**Appendix A**

| Position | DNI Rate | BLS (50%) | Delta: Base Year | Delta: Year 2 | Delta: Year 3 | Total |
|---|---|---|---|---|---|---|
| Acquisition Specialist, Subject Matter Expert | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Contracts Administrator, Senior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Communication Specialist, Junior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Financial Analyst, Junior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Financial Analyst, Senior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Human Resources Administrative Assistant, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Program Analyst, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Program Analyst, Senior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Program Specialist, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Computer Systems Analyst, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Database Architect, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Telecommunications Specialist, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Web Application Developer, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Configuration Management Specialist, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Data Analyst, Journeyman | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Network Engineer, Senior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Systems Engineer, Senior Ft Bliss | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Systems Engineer, Senior Team Lead Ft Bliss | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Systems Engineer, Subject Matter Expert | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Logistics Specialist, Junior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Maintenance Supervisor | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| Program Specialist, Junior | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} | {redacted} |
| | | | | | | |
| Total | | | $375,100.00 | $400,401.00 | $431,828.32 | $1,207,329.32 |